Below is an opinion of the court.

*David W. Hercher*
_____
DAVID W. HERCHER
U.S. Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## THE DISTRICT OF OREGON

| | |
|---|---|
| In re | |
| **Poondarik Sours**, | Case No. 21-31943-dwh7 |
| Debtor. | MEMORANDUM DECISION ON MOTIONS TO EXTEND TIME TO FILE COMPLAINTS OBJECTING TO DISCHARGE AND REQUESTING DISCHARGEABILITY DETERMINATION AND TO MOVE TO DISMISS |

## I.     Introduction[1]

Lesbia Tejeda has moved for an extension of the deadline to file a complaint objecting to the discharge of debtor, Poondarik Sours, and to request a determination that Sours's debt to Tejeda is nondischargeable.[2] And Greg Garvin, the Acting United States Trustee for Region 18, has moved

---

[1] This disposition is specific to this action. It may be cited for whatever persuasive value it may have.
[2] ECF No. 16.

Page 1 – MEMORANDUM DECISION ON MOTIONS TO EXTEND etc.

to extend the deadlines to file a complaint objecting to Sours's discharge and to move to dismiss her case for abuse.[3]

For the reasons that follow, I will grant Tejeda's and the U.S. trustee's motions to extend the discharge-objection deadline, but I will deny Tejeda's motion to extend the dischargeability deadline and the U.S. trustee's motion to extend the dismiss-for-abuse motion deadline.

## II. Facts

In 2017, Sours and her husband, Timothy Sours, bought real property on Onyx Road in Terrebonne for $115,000.[4]

On September 4, 2019, Tejeda filed a state-court action against Sours. Before she filed that action, her state-court lawyer, Mike Pijanowski, had learned that Sours had an ownership interest in what he later described as two parcels of real estate.[5]

On August 9, 2021, Sours conveyed her interest in the jointly owned property to Timothy and Andrew Sours, her son, for no consideration.[6] On that day, the trial of Tejeda's state-court action was set to begin on August 31, 2021. At Sours's request, the trial was later rescheduled to begin in September 2021.[7]

---

[3] ECF No. 19.
[4] ECF No. 32 at 2 ¶ 4, Ex. A at 5; ECF No. 45 at 2 ¶ 3 (conveyance deed was from Sours and Timothy); ECF No. 51.
[5] ECF No. 32 at 2 ¶ 4, Ex. A at 5.
[6] ECF No. 15 items 2 and 18; ECF No. 32 at 2 ¶ 4, Ex. A at 5.
[7] ECF No. 32 at 3 ¶ 6.

Page 2 – MEMORANDUM DECISION ON MOTIONS TO EXTEND etc.

Sours filed her petition initiating this case on September 16, 2021.[8] Her bankruptcy lawyer was Theodore Piteo. She said that her debts are not primarily consumer debts[9] and that she lived at an address in Beaverton.[10] With her petition, she filed her Schedule A/B[11] property schedule and Schedule C[12] claim of exempt property, neither of which listed any real property. She also filed with her petition a Statement of Financial Affairs (SoFA) in which she said that during the last three years she had not lived anywhere but where she then lived.[13] In the SoFA, she answered "no" to whether she had made any out-of-ordinary-course property transfers within the last two years.[14]

The meeting of creditors was on October 14, 2021.[15] When Eiler asked Sours whether she had "given away" any property worth more than $2,000 during the past two years, she did not mention her transfer of the property.[16]

On November 8, 2021, Pijanowski emailed Piteo.[17] After introducing himself as Tejeda's state-court lawyer,[18] he said that, before filing the state-court complaint, he had learned that Sours had an ownership interest in

[8] ECF No. 1.
[9] ECF No. 1 at 6, item 16a.; ECF No. 4 at 1, item 1.
[10] ECF No. 1 at PDF 2 item 5.
[11] ECF No. 1 at PDF 13 item 1.
[12] ECF No. 1 at PDF 18–19 item 2.
[13] ECF No. 1 at PDF 34 item 2.
[14] ECF No. 1 at PDF 38 item 18.
[15] ECF No. 7.
[16] ECF No. 45 ¶ 6.
[17] ECF No. 32 at 2 ¶ 4, Ex. A at 4–5; ECF No. 48 at 2 ¶ 4, Ex. A at 4–5.
[18] ECF No. 32 ¶ 8, Ex. B at 1.

what he described as two parcels of Oregon real estate, one of which he had learned that she quitclaimed in August 2021. He attached to his email to Piteo a copy of the quitclaim deed. He had noticed that what he referred to as "the petition" had no information about the property transfer, which "was for less than value" because the property had been bought for $115,000 in 2017 but conveyed in consideration of what he thought was $200. Pijanowski concluded by asking Piteo why "the transfer (or asset) wasn't included in the schedules."

On November 22, 2021, Pijanowski emailed Kenneth Eiler, the case trustee, with the same information he had sent to Piteo on November 8, including the deed.[19]

Also on November 22, Eiler forwarded Pijanowski's email to Christian Torimino, a lawyer for the U.S. trustee, adding that the transferred property was valued by Zillow at more than $600,000. Eiler also relayed that Sours "has a sizeable, $11,000+ crypto account," which "suggests some sophistication as far as buying and holding crypto currency," and "[i]f she hid this real property transfer, she may be hiding more crypto."[20] November 22 was Monday of Thanksgiving week, a shortened holiday week for Torimino. Torimino took two sick days the week of November 29 through December 3.[21]

---

[19] ECF No. 45 at 2 ¶ 3, Ex. 1 at 1–2.
[20] ECF No. 45 ¶ 3.
[21] ECF No. 45 ¶ 7.

On December 2, Torimino emailed Piteo to request consent to a Federal Rule of Bankruptcy Procedure (Rule) 2004 examination of Sours and extension of the discharge-objection deadline to accommodate a 14-day examination notice.[22] The automated email reply from Piteo stated that he was out of the office until December 6.[23]

On December 7, Piteo responded to Torimino, saying that Piteo was having trouble contacting Sours and would be moving to withdraw.[24] Piteo filed that motion on December 10, 2021.[25]

Also on December 7, Justin Leonard filed a notice of appearance in this case on behalf of Tejeda.[26]

And he followed up on Pijanowski's November 22 email to Piteo, who promptly responded that he had not been able to confer with Sours and did not respond again until after the extension motion was filed.[27] In Piteo's email to Leonard of 4:54 p.m. that day, he said that "the U.S. trustee is already sniffing around so I don't think your client needs to be too concerned about the 523/727 deadline."[28] In Leonard's email to Piteo of 5:01 p.m. that day, he said that Tejeda wanted to preserve the ability to file a 523 complaint "or" a 727 complaint. He said he believed that "523 may apply to at least

---

[22] ECF No. 45 ¶ 8.
[23] ECF No. 45 ¶ 9.
[24] ECF No. 45 ¶ 10.
[25] ECF No. 17.
[26] ECF No. 13.
[27] ECF No. 32 ¶ 4.
[28] ECF No. 32 Ex. A at 3.

some of our client's claim, so I expect we will want to file a complaint unless we can negotiate a stipulation."[29]

On December 10, Sours filed both an amended Schedule C and an amended SoFA. The amended SoFA includes pages 1 and 8 of the 12-page form. She also filed a signed custom-prepared notice of amendment. She did not file with the amended documents Official Form 106-DEC, the form Declaration About an Individual Debtor's Schedules. The amended Schedule C claims an exemption in real property at Onyx Road.[30] The amended SoFA states that (1) Sours lived at Onyx Road "From Jan/2017 To Dec/2021," (2) the property is worth $348,810, and (3) she transferred it on August 9, 2021, to Timothy and Andrew for no consideration.[31] The December 10 amendments did not amend the property Schedule A/B.

On December 13, 2021, Piteo moved to withdraw.[32] On December 30, he filed an amended motion for leave to withdraw.[33]

On January 7, 2022, Eiler filed a complaint initiating an adversary proceeding against Timothy and Andrew seeking to avoid and recover Sours's transfer to them.[34] On April 13, Eiler filed an amended complaint, in which he alleged that, on January 28, 2022, Timothy and Andrew executed and

---

[29] ECF No. 32 Ex. A at 2.
[30] ECF No. 14.
[31] ECF No. 15 items 2 and 18.
[32] ECF No. 17.
[33] ECF No. 33.
[34] Adversary Proceeding No. 22-03008 ECF No. 4.

Page 6 – MEMORANDUM DECISION ON MOTIONS TO EXTEND etc.

recorded a quitclaim deed to Sours and Timothy in an apparent attempt to undo the 2021 transfer. But Eiler also alleges that the 2022 deed's legal description does not match that in the 2021 deed, requiring him to continue the adversary proceeding.[35] Eiler also added to the complaint a claim for a determination that he may sell the entire interest in the property under section 363(h).[36]

## III.    Motions, briefs, and argument

The extension motions were filed on December 13,[37] the deadline—60 days after the first date set for the meeting of creditors—imposed by Rules 4007(c) and 4004(a) to file actions under 11 U.S.C. §§ 523 and 727 to determine that a debt is nondischargeable and to object to a debtor's discharge and the deadline under Rule 1017(e) to move under section 707(b)(1) and (3) to dismiss this case for abuse. (Other section references are also to title 11.)

The U.S. trustee's motion states that he "is investigating" Sours's transfers of possible estate assets including real property."[38] The motion describes unsuccessful attempts to arrange through Piteo for a Rule 2004 examination of Sours.[39] And it seeks extension of the Rule 4004(c) deadline to bring a discharge-objection action and the Rule 1017(e) deadline to move to dismiss this case for abuse.

---

[35] Adversary Proceeding No. 22-03008 ECF No. 27 at 4 ¶ 17–18.
[36] Adversary Proceeding No. 22-03008 ECF No. 27 at 5 ¶¶ 19, 27–32.
[37] ECF Nos. 16, 19.
[38] ECF No. 19 ¶ 4.
[39] ECF No. 19 ¶ 5.

In Tejeda's motion, she states that she has "questions and concerns" about (1) Sours's "assets and undisclosed pre-petition transactions of real property that implicate 11 U.S.C. §727," (2) "whether at least a portion of Movant's claim is nondischargeable under 11 U.S.C. § 523," and (3) "whether [Sours] would agree to stipulate to a resolution to avoid the expense of further litigation regarding Movant's claims."[40] Tejeda describes multiple requests over "nearly a week" for additional information from Piteo, to which Leonard received no substantive response.[41] And she argues that cause exists for extensions of both deadlines because she "is continuing her investigation of [Sours's] assets, disclosures, and prepetition activities diligently, and will continue to attempt to resolve her issues consensually with" Sours.[42]

On December 28, 2021,[43] Sours filed a response to Tejeda's motion, contesting Tejeda's debt claim against Sours and labeling Tejeda's extension motion as "last minute" because it was filed on the deadline.

On December 29, Leonard filed a declaration in support of Tejeda's motion, specifically addressing Sours's argument that Tejeda's motion is "last minute." He laid out the timeline of steps, described above, taken by himself and Pijanowski. Leonard requested the extension "to seek additional informal discovery" or to arrange a Rule 2004 examination of Sours "and possibly third

---

[40] ECF No. 16 at 2–3 ¶ 8.
[41] ECF No. 16 ¶¶ 9, 11.
[42] ECF No. 16 at 2.
[43] ECF No. 29.

parties to inquire regarding other potential assets of the Estate that have not yet been disclosed."[44]

On January 4, 2022, I granted Piteo's withdrawal motion.[45]

On January 12, 2022, Sours filed a letter objecting to the extension motions as "last minute."[46]

Also on January 14, Leonard filed an amended declaration in support of Tejeda's extension motion. According to that declaration—Sours's filings on December 10[47] and 23[48] "alone demonstrate failure to disclose assets and transfers, which is indeed one reason to deny the Debtor's discharge."[49] The 60-day deadline extension is needed to seek additional informal discovery to inquire about other potential assets of the estate that have not yet been disclosed, as well as to evaluate the intent behind the representations and the transfer.[50]

On January 14, 2022, Torimino filed a declaration and a brief in support of the U.S. trustee's motion.[51] In the declaration, he laid out the timeline of steps that he took after receiving Eiler's email on November 22, 2021. Before November 22, his office "essentially had no knowledge of this case or this

---

[44] ECF No. 32.
[45] ECF No. 34.
[46] ECF No. 44.
[47] ECF Nos. 14, 15.
[48] ECF No. 27.
[49] ECF No. 48 ¶ 5.
[50] ECF No. 48 ¶ 5.
[51] ECF Nos. 45, 46.

debtor beyond the routine analysis of the § 707(b)(2) means test (which did not apply because Debtor has primarily non-consumer debts."[52] "[o]ur office believed when the Motion was filed that further discovery (specifically, a deposition) was necessary to determine [Sours's] interest in trusts and [her] state of mind" when she transferred real property "weeks before the bankruptcy filing" and failed to disclose the transfer in her SoFA and in response to Eiler's question at the meeting of creditors. He also pointed to Sours's December 28 letter,[53] which he said "strongly suggests that there may be merit to an action under § 727 or § 707(b)(3)."[54] He reported that he had discussed with Sours a potential Rule 2004 examination.[55] In his experience, the vast majority of U.S. trustee investigations into potential actions against debtors "proceed informally and consensually," and debtor cooperation often results in his office "concluding our investigation and allowing Debtors to proceed to discharge without defending motions or complaints that may lack merit."[56] The motion is warranted by the need to correspond with "a now *pro se* Debtor on complicated motions or complaints that may lack merit." Despite claiming to need to examine Sours about "her interest in trusts," he does not explain the basis of any suspicion that she has an undisclosed interest in trusts.

---

[52] ECF No. 45 at 2, ¶ 4.
[53] ECF No. 30
[54] ECF No. 45 at 3 ¶ 14.
[55] ECF No. 45 at 3-4 ¶ 15.
[56] ECF No. 45 at 4 ¶ 16.

In Torimino's brief, his said that the U.S. trustee has "concerns that there may be other false statements in the schedules, particularly involving cryptocurrency and an interest in a trust." In his declaration, the only mention of cryptocurrency was Eiler's suspicion that Sours's hiding of the real-property transfer suggests that she might also be hiding cryptocurrency in addition to the amount that she did schedule. And Torimino's only mention of a trust was his stated belief that he needed to examine Sours about her "interest in trusts." He does not state in the declaration or brief any basis, other than Sours's hiding of the real-property transfer, for suspecting that Sours underdisclosed her cryptocurrency or failed to disclose any trusts.

On January 28, Sours filed a declaration responding to both extension motions.[57] She challenges at least the U.S. trustee's motion, and perhaps both motions, as "a last-minute claim" because the motions were filed on the deadline of December 13, and she points out that more than four months has passed since the petition date. She also attributes what she refers to as "mistakes" to the "language barrier I struggle with." She claims to "have trouble reading, writing and understanding information in the English language" and does "not feel confident in my ability to understand and answer questions in a professional setting in English." She asserts that "it would have been proper if I had a translator during my questionnaire in the

---

[57] ECF No. 61.

bankruptcy process." Nothing earlier in the record identified her language barrier.

## IV. Statutes, rules, and case law

### A. *Statutes and rules*

A chapter 7 debtor is entitled to a discharge of debts unless there exist any of 12 conditions in section 727(a). One of the conditions is that the debtor, with intent to hinder, delay, or defraud a creditor, transferred the debtor's property within one year before the petition date.[58] Another is that the debtor has knowingly and fraudulently, in or in connection with the case, made a false oath or account.[59] The U.S. trustee, a creditor, or the case trustee may object to the discharge on any of the 727(a) grounds.[60] An objection is made by filing a complaint initiating an adversary proceeding.[61] I will refer to a discharge-objection complaint as a 727 complaint.

Once entered, the discharge covers most but not all prebankruptcy debts.[62] Under section 523(c), certain kinds of debts can be excepted from discharge, but only if the court determines the debt to be nondischargeable in response to a complaint the creditor files. I will refer to a complaint to determine the dischargeability of a debt as a 523 complaint.

---

[58] Section 727(a)(2)(A).
[59] Section 727(a)(4)(A).
[60] Section 727(c)(1).
[61] Fed. R. Bankr. P. 7001(4).
[62] See sections 523, 524.

Page 12 – MEMORANDUM DECISION ON MOTIONS TO EXTEND etc.

Section 707 governs dismissal of a chapter 7 case. Under section 707(b)(1), the court can dismiss a chapter 7 case filed by an individual with primarily consumer debts if relief would be an abuse of chapter 7. Under section 707(b)(3), in considering whether to dismiss a case as abusive, the court must consider whether the petition was filed in bad faith or the totality of the circumstances demonstrates abuse.

The deadline to file 523 and 727 complaints and dismiss-for-abuse motions is 60 days after the first date set for the meeting of creditors. That deadline applies to a 523 complaint under Rule 4007(c), to a 727 complaint under Rule 4004(a), and to a dismissal motion under Rule 1017(e). If no timely 727 complaint is filed, the bankruptcy court must grant a discharge "forthwith."[63]

The court can extend the 60-day deadline "for cause." That's permitted by Rule 4007(c) for a 523 complaint, Rule 4004(b)(1) for a 727 complaint, and Rule 1017(e)(1) for a dismissal motion.

None of the rules defines "cause."

### B. *Case law applying Rules 4007 and 4004 to 523 and 727 complaints*

Because Rules 4004 and 4007 both address whether and to what extent a debtor should receive a discharge, courts have recognized that "the standard for application of the time limits in those Rules should be consistent."[64] And

---

[63] Section 727(c)(1).
[64] *In re* Bomarito, 448 B.R. at 248.

because both rules set the identical 60-day deadline and permit extensions only for cause, cases interpreting Rule 4007(c) apply in interpreting Rule 4004(b).[65]

### 1. *Willms v. Sanderson*

No U.S. Supreme Court case defines cause for extension of the deadline.

In the Ninth Circuit's 2013 decision in *Willms v. Sanderson*,[66] the court interpreted cause in Rule 4007(c), disagreeing with the bankruptcy court's extension of time for two creditors to file a 523 complaint. The creditors timely requested extension of the 727 deadline and only later sought and obtained extension of the 523 deadline.

As its first ground for reversal, the court held that the bankruptcy court could not treat the timely request to extend the 727 deadline as including a request to extend the 523 deadline.[67] Thus, the 523-extension request was untimely.

But an alternate ground for the court's reversal was that the bankruptcy court did not make a finding of cause for the extension.[68] To show cause under Rule 4007(c) for extension of the 523 deadline, the extension motion must "show cause why the extension is necessary."[69] The only cause the

---

[65] Kontrick v. Ryan, 540 U.S. 443, 448 n.3 (2004); *In re* Santos, 112 B.R. 1001, 1004 n.2 (9th Cir. B.A.P. 1990).
[66] 723 F.3d 1094 (9th Cir. 2013).
[67] *Willms*, 723 F.3d at 1102.
[68] *Willms*, 723 F.3d at 1103, citing Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 382 (1993).
[69] *Willms*, 723 F.3d at 1100.

Page 14 – MEMORANDUM DECISION ON MOTIONS TO EXTEND etc.

creditors asserted was that "they needed additional time 'to complete an investigation and evaluate whether or not a complaint objecting to discharge or a motion to dismiss is warranted.'" It was "critical" that "they failed to explain *why* they did not complete their investigation prior to the deadline." The court acknowledged that "the 'cause' standard may be a lenient one," but nonetheless held that—

> accepting the [creditors'] request for more time so that they could determine whether or not they even *had* a viable argument for nondischargeability—without any explanation why they could not have made this determination within the time set by Rule 4007—would render the standard toothless.[70]

*Willms* includes the following sentence, cited by Tejeda: "At a minimum, 'cause' means excusable neglect," citing the Supreme Court's 1993 decision in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. LP*.[71] In a footnote after that sentence, the *Willms* court described *Pioneer* as having—

> embraced the factors that we previously identified as relevant to determining the existence of excusable neglect: (1) whether granting the delay would prejudice the debtor; (2) the delay's length and impact on efficient court administration; (3) whether the delay fell within the reasonable control of the person whose duty it was to perform; (4) whether the creditor acted in good faith; and (5) whether clients should be penalized for the mistake or neglect of their counsel. 507 U.S. at 385, 113 S.Ct. 1489.[72]

As the cause-analysis framework is articulated in *Willms*, the requirement that the creditors show that they could not have timely

---

[70] *Willms*, 723 F.3d at 1104.
[71] ECF No. 48 at 4–5 ¶ 12, citing *Willms*, 723 F.3d at 1103 & n.7, citing *Pioneer*, 507 U.S. 380, 382 (1993).
[72] *Willms*, 723 F.3d at 1103 n.7.

Page 15 – MEMORANDUM DECISION ON MOTIONS TO EXTEND etc.

determined whether they had a viable ground for complaint is a requirement, rather than one of several factors that the bankruptcy court should consider. Thus, if the movant was able to determine timely whether it had a viable ground for complaint, whether or not it had actually made that determination, the analysis stops, and the motion must be denied.

The *Willms* framework for determining cause appears unique to this circuit. The court of appeals has not addressed the issue in a precedential decision since *Willms*.

One definition of viable is "capable of working, functioning, or developing adequately."[73] Whether a complaint initiating a civil action is viable should be determined considering its intended purpose. A complaint is filed not just to survive motions to dismiss and for sanctions, but also to obtain and enforce a judgment. Thus, a creditor who has only enough information to prepare and file a complaint that would survive motions to dismiss and for sanctions, but not the additional information necessary to determine that the creditor **has** a reasonable likelihood of prevailing at trial and that the litigation benefit is worth the cost and risk, would not be able, within the meaning of *Willms*, to file a viable complaint.

### 2. Other decisions

Because the *Willms* creditors gave no reasons why they were unable to meet the 523 deadline, the Ninth Circuit did not address factors that other

---

[73] https://www.merriam-webster.com/dictionary/viable.

courts have considered in determining whether cause exists for an extension. Among the oft-cited lists of cause factors is the five-factor list in *In re Nowinsksi*, a 2003 Southern District of New York bankruptcy decision:[74]

- whether the creditor had sufficient notice of the deadline and the information to file an objection;

- the complexity of the case;

- whether the creditor exercised diligence;

- whether the debtor refused in bad faith to cooperate with the creditor; and

- the possibility that proceedings pending in another forum will result in collateral estoppel on the relevant issues.

Expanding on the fourth factor, the *Nowinski* court held that "[w]ithout a finding of bad faith on the part of the debtor, however, mere recalcitrance in discovery does not support a finding of cause."

### 3.     Excusable neglect

It's difficult to know what to make of *Willms*'s reference to excusable neglect and citation to *Pioneer*. Excusable neglect does not appear in Rule 4007(c) as a ground for extension of the 523 deadline; neither does it appear in Rule 4004(b)(1).

---

[74] 291 B.R. 302, 305-06 (Bankr. S.D.N.Y. 2003). See also *In re* Ballas, 342 B.R. 853 (Bankr. M.D. Fla. 2005), aff'd, 212 Fed. App'x. 867 (11th Cir. 2006); *In re* Stonham, 317 B.R. 544, 547 n.1 (Bankr. D. Colo. 2004).

The only rule where "excusable neglect" does appear is Rule 9006(b)(1). There, it's the prerequisite for extension of deadlines that have expired— those that have been neglected, hence the reference to excusable neglect: neglect that is excusable. But by its terms, Rule 9006(b)(1) simply does not apply to requests for extension of the 523 and 727-complaint deadline. That's because it expressly excludes Rules 4004(a) and 4007(c) from the effect of Rule 9006(b)(1).[75] The Supreme Court observed in *Pioneer* that Rule 9006(b)(3) "enumerates those time requirements *excluded* from the operation of the 'excusable neglect' standard."[76]

Rule 9006(b) does set cause as a prerequisite for any deadline extension request, whether or not timely. In *Pioneer*, the creditor failed—neglected—to timely file its proof of claim in a chapter 11 case, and it made a late request for extension of the deadline to file its claim, so it had to demonstrate excusable neglect. The Court addressed factors to consider when determining whether a creditor had demonstrated excusable neglect, warranting an extension of the claim-filing deadline. But whether the creditor satisfied the general requirement of cause for the extension was neither at issue nor addressed.

Here, when Tejeda and the U.S. trustee filed their extension motions on December 13, they hadn't neglected to do anything; the deadline to file

---

[75] See *In re* Stonham, 317 B.R. 544, 547 (Bankr. D. Colo. 2004) (application of excusable neglect to Rule 4007(c) "is improper").
[76] *Pioneer*, 507 U.S. at 389 n.4 (emphasis in original).

Page 18 – MEMORANDUM DECISION ON MOTIONS TO EXTEND etc.

complaints hadn't run, so they hadn't yet neglected to file complaints, and for that reason they also hadn't neglected to file their extension motions, which they timely filed. For that reason, the language of the rules and logic suggest that *Pioneer* and excusable neglect have no application to Rule 4007(c), and there was no apparent reason for the *Willms* court to address them in the context of interpreting cause. After the single sentence mentioning excusable neglect, the court does not mention excusable neglect again while addressing whether the creditors established cause for a deadline extension.

Statements in a precedential Ninth Circuit decision that are "made in passing, without analysis, are not binding precedent."[77] Conversely, a statement is circuit law if an issue was "presented for review," addressed by the court, and decided in an opinion joined in relevant party by a majority of the panel, all regardless of whether it was in some technical sense "necessary" to the disposition.[78]

Both Tejeda and the U.S. trustee suggest that the Ninth Circuit's statement that "at a minimum, 'cause' means excusable neglect" means that the existence of excusable neglect always constitutes cause.[79]

---

[77] *In re* Magnacom Wireless, LLC, 503 F.3d 984, 993-94 (9th Cir. 2007), citing United States v. Johnson, 256 F.3d 895, 915 (9th Cir. 2001).
[78] Barapind v. Enomoto, 400 F.3d 744, 750-51 (9th Cir. 2005), citing Cetacean Cmty. v. Bush, 386 F.3d 1169, 1173 (9th Cir. 2004); Miranda B. v. Kitzhaber, 328 F.3d 1181, 1186 (9th Cir.2003) (per curiam); United States v. Johnson, 256 F.3d 895, 914–16 (9th Cir.2001) (en banc) (Kozinski, concurring).
[79] ECF Nos. 46 at 1, 48 ¶ 12.

I disagree, for two reasons. First, the plain meaning of the single sentence mentioning excusable neglect and *Pioneer* is not that a showing of excusable neglect always constitutes cause. Rather, it means that the cause standard is no less demanding than the excusable-neglect standard. It does not mean that satisfying the excusable-neglect standard also constitutes cause for an extension.

Second, the Ninth Circuit discussed the facts of *Willms*—specifically, the creditors' failure to show that they could not have determined whether they had a ground for a 523 complaint by the original deadline—only in the context of whether those facts constituted cause for an extension. The court did not discuss how the *Pioneer* excusable-neglect factors would apply to those facts.

I have found no post-*Willms* decision holding that excusable neglect is a standard for finding cause under Rule 4007(c) or 4004(b). Seven years after *Willms*, in a 2020 nonprecedential Ninth Circuit BAP decision, *In re Emond*, the court evaluated cause for a Rule 4007(c) extension without mentioning excusable neglect, then reversed the bankruptcy court's 523 extension because the extension request included no explanation "why the creditor could not file the complaint within the original deadline." The court mentioned *Willms* only as authority for applying an abuse-of-discretion

standard of review to a bankruptcy court's decision to grant a

523 extension.[80]

## 4.    Summary: meaning of cause

Although the Ninth Circuit in *Willms* said that an extension motion must "show cause why the extension is necessary," it didn't expand on the meaning of "necessary"—and it had no reason to under the facts there. Under the most exacting meaning of necessary, an extension could necessary in the sense that the filing of the complaint based only on the information then available to the movant would violate a court rule, either because it fails to allege facts plausibly stating a claim on which relief can be granted, warranting dismissal under Federal Rule of Civil Procedure 12(b)(6), or that its factual contentions lack evidentiary support and will not likely have that support after a reasonable opportunity for further investigation or discovery, in violation Rule 9011(b)(3). A less-exacting meaning of necessity would take into consideration the real-world considerations of a reasonable litigant, who, in addition to avoiding dismissal or sanctions, would often reasonably prefer to use all readily available sources of information to determine that there is a reasonable likelihood of prevailing at trial and that benefits of prevailing outweigh the costs. I have found no case authority adopting either sense in evaluating cause, but the less-exacting standard more properly balances the

---

[80] No. NV-19-1157-GLB, 2020 WL 3071975, at *1 (9th Cir. B.A.P. June 5, 2020).

Page 21 – MEMORANDUM DECISION ON MOTIONS TO EXTEND etc.

statutory interests in granting the discharge to the poor-but-honest debtor, as reflected both in the discharge and the dischargeability and discharge exceptions.

### C. Case law applying Rule 1017(e) to 707(b) dismiss-for-abuse motions

The Supreme Court has recognized the normal rule of statutory construction that "identical words used in different parties of the same act are intended to have the same meaning."[81] The same principle should apply to Rules.[82] Rules 1017(e), 4004(b), and 4007(c) all have the same "for cause" standard to extend a deadline expiring 60 days after the first date set for the meeting of creditors. So, the analysis above of cause in Rules 4004(b) and 4007(c) should equally apply to cause in Rule 1017(e), governing the deadline to file a section 707(b) dismiss-for-abuse motion.

## V. Application of excusable-neglect factors to 727 motions

Despite my conclusion that *Willms* doesn't require that a showing of excusable neglect to establish cause for a deadline extension, I will address the specifics of the pending 727 motions in the context of the five excusable-neglect factors listed in *Willms*.

### A. Whether granting the delay would prejudice the debtor

Any delay in granting the discharge will always prejudice the debtor by depriving the debtor of early repose—the certainty that no dischargeability or

---

[81] Atl. Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433 (1932).
[82] See *In re* Bomarito, 448 B.R. 242, 248 (Bankr. E.D. Cl. 2011).

discharge-objection litigation can be commenced. But the debtor's interest in repose is mediated by the interest in limiting the discharge, evident in the dischargeability and discharge exceptions.

Here, Sours was alerted as early as November 8 of concern about the property transfer, and her incomplete and contradictory December 10 filings created uncertainty regarding whether the transfer had occurred or had been reversed. Any prejudice to Sours of the requested extension is minor and appropriate and does not weigh against granting the extension.

**B.** ***The delay's length and effect on efficient court administration***

The length of the requested delay (extension) is 60 days, which, had I granted the motions immediately, would have expired on February 11, 2022, and would not have negatively affected court administration. I cannot charge against any party the additional time for which I have had the motions under consideration. In any case, Eiler is now prosecuting an adversary proceeding to avoid the property transfer, so even with the time I have taken to decide the motions, granting the requested 727 extension is still unlikely to negatively affect efficient court administration.

**C.** ***Whether the delay fell within the reasonable control of the person whose duty it was to perform***

Based on the deed, its nondisclosure in the original SoFA or at the meeting of creditors, and the pending Tejeda litigation, Tejeda and the U.S.

trustee could have timely filed complaints under section 727(a)(2)(A) and (a)(4).

But Sours's filings on December 10—three calendar days and one business day before the deadline—were incomplete and inconsistent, creating uncertainty about whether the transfer had actually occurred or had been reversed. Listing the property in the amended Schedule C is consistent with her having owned the property on the petition date (and not having previously transferred it), but it's inconsistent with the property's absence from an amended Schedule A/B (none was filed then) and the statement in the amended SoFA that she transferred it on August 9 for no consideration. The legal efficacy of every statement she made in those filings is in question because she didn't file with the amended Schedule C the required Official Form 106-DEC, the form Declaration About an Individual Debtor's Schedules, and she filed only two pages of the amended SoFA, without its signature page.

Neither of the possible scenarios suggested by the December 10 filings would eliminate any possible 727 claim. If the property hadn't been transferred, it should have been listed on Schedule A/B, and if it was transferred, the transfer should have been listed in the SoFA—even if the property was later returned. But if the property hadn't been transferred, a claim under section 727(a)(2)(A) would be inappropriate. And depending on the value of the equity in the returned property and the amount of allowed

claims in the case, the reversal could enable creditors to be paid in full, eliminating any economic benefit of dischargeability or discharge-objection litigation. Here, Sours scheduled unsecured claims of $80,274 and no secured claims;[83] before January 4, 2022, the filed proofs of claim totaled $41.284.05;[84] Sours valued the property at $348,810; and Eiler earlier thought it was worth $600,000. Thus, as of December 10, Tejeda and the U.S. trustee could have thought that they needed to confirm whether the property had in fact been returned, because the return would both remove the basis for a section 727(a)(2)(A) claim and require evaluation whether the estate would be solvent, making any discharge-objection action uneconomical.

From December 7, when Piteo's firm had been asked by Sours to withdraw, until after the December 13 deadline (through January 4, 2022, when I granted Piteo's December 13 motion to withdraw), any attempt by Leonard and Torimino to communicate with her through Piteo to persuade her to voluntarily submit to examination or to schedule a compelled examination would apparently have been futile, and any direct communication would have been unethical.

A movant's need to investigate whether a discharge-objection action is economical is something that a reasonable litigant, especially if advised by a responsible lawyer, "needs" to do. In the ordinary case, information to make

---

[83] ECF No. 1 at PDF 11.
[84] Proofs of claim 1-1, 2-1, 3-1, 4-1.

the cost-benefit evaluation will be available at or soon after the petition date or at least the meeting of creditors, or the absence or late discovery of that information cannot be charged to the debtor. But in this unusual case, it was Sours's filings shortly before the deadline that created the need to evaluate whether the transfer had actually occurred and, if it hadn't, whether a discharge-objection action would thus be uneconomical. When the impetus for the investigation arises shortly before the deadline, investigation is necessary, constituting cause for an extension under *Willms*. That's particularly true because discouraging the filing of a well-founded but uneconomical action advances not just the interest of the movant but also the debtor's interest in not having to defend a discharge-objection action, albeit at the cost of some delay in receiving repose.

Thus, I find that the delay was not in the reasonable control of Tejeda or the U.S. trustee.

### D.    *Whether the creditor acted in good faith*

Tejeda and the U.S. trustee sought in a professional and progressive manner (if not, in retrospect, as fast as would have been ideal) to obtain information from which to evaluate whether it would be both technically proper and economical to bring a discharge-objection action. I thus have no basis to find that they acted in bad faith.

### E. Whether clients should be penalized for the mistake or neglect of their counsel

Under *Pioneer*, a court evaluating excusable neglect must attribute to a client the fault of its lawyer.[85] I have not failed to attribute to Tejeda and the U.S. trustee the actions of their lawyers, who I have noted could have acted sooner. But I have nonetheless found that the circumstance as a whole establish cause to extend the discharge-objection deadline.

### F. Nowinski *cause factors*

Of the five *Nowinski* cause factors discussed in part IV.B.2 on page 16 above—

- Neither Tejeda nor the U.S. trustee denies sufficient notice of the deadline.

- This case is not unusually complex for the chapter 7 of an individual small-business owner. I have addressed the ambiguity introduced by Sours's December 10 filings, which weighs in favor of the requested extension that I will grant.

- I have alluded to Tejeda's and the U.S. trustee's diligence above, mentioning that they—particularly Tejeda—could have acted sooner. I could not find that Tejeda acted diligently before December 10; she could and should have sought formal discovery promptly after not hearing back from Piteo. I could find that,

---

[85] *Pioneer*, 507 U.S. at 397.

marginally, that the U.S. trustee had acted diligently before December 10 due to the late date on which Eiler communicated with Torimino. But the ambiguity introduced by Sours's December 10 filings outweighs Tejeda's lack of diligence before December 10.

- It's not clear what "bad faith" means in the *Nowinski* factors list. I don't find that Sours sought, or even expected, to mislead by refusing to communicate with Piteo so he could respond to multiple lawyer inquiries. But I do find that she knew or should have known that the inquiries were reasonable and would be pursued, so her failure to communicate with Piteo weighs against her and in favor of a cause finding.

- There was no possibility that proceedings in another forum would result in collateral estoppel on relevant issues.

### G. Other grounds for cause argued by the parties

Because I will grant Tejeda's and the U.S. trustee's 727-extension motions, I need not and will not address any of their supporting arguments that I have not otherwise addressed.

## VI. Cause to extend 707(b) deadline

The U.S. trustee's motion does not address section 707(b)'s limitation to debtors with primarily consumer debts, and the U.S. trustee acknowledges

that Sours claims to have primarily nonconsumer debts and does not dispute that fact.

Without some suggestion that, in fact, Sours's debts are primarily consumer, no section 707(b) motion could be filed. I thus cannot find cause to extend the deadline to file such a motion.

## VII.   Tejeda's motion to extend 523 deadline

In Tejeda's motion, she states that she has "questions and concerns" about "whether at least a portion of Movant's claim is nondischargeable under 11 U.S.C. § 523," but she does not state what those questions are. She later alleges that she "is a valid creditor who can file a complaint under 11 U.S.C. . . . § 523"[86] and that "at least a portion of [her] claim is nondischargeable under 11 U.S.C. § 523 . . .."[87] She makes no other specific arguments in support of her request to extend the section 523 deadline or why she was unable to timely file a 523 complaint, such as any postpetition act or omission of Sours that prevented Tejeda from filing a 523 complaint.

Under *Willms*, to establish cause for extension of the 523 deadline, a movant must offer at least an "explanation why [the movant] could not have made this determination [whether the movant had a viable 523 claim] within the time set by Rule 4007." Absent that explanation, I cannot find cause for that extension.

---

[86] ECF No. 48 at 3 ¶ 7.
[87] ECF No. 48 at 4 ¶ 9.

## VIII.  Conclusion

I will grant Tejeda's and the U.S. trustee's requests to extend the

727 deadline and extend it for both of them through the 60th day after entry

of the order. I will deny Tejeda's motion to extend the 523 deadline and the

U.S. trustee's motion to extend the 707(b) deadline.

I will enter a separate order.

### #